IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| OLGA SOKOLOVA, et al., | ) | |
|---|---|---|
| | ) | |
| Plaintiffs, | ) | No. 18 C 2576 |
| | ) | |
| v. | ) | Magistrate Judge Jeffrey Cole |
| | ) | |
| UNITED AIRLINES, INC., | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

**A**.

We are told with increasing frequency that "[p]re-trial discovery under modern federal practice has become a monster on the loose and that "[p]re-trial proceedings have become more costly and important than trials themselves,'" *A.H. Robins Co. v. Piccinin*, 788 F.2d 994, 1013 (4th Cir. 1986). Indeed we have it on the highest authority that "protracted pretrial discovery is the bane of modern federal litigation." *Rossetto v. Pabst Brewing Co., Inc.,* 217 F.3d 539, 542 (7th Cir. 2000). *Accord*, *Menard v. CSX Transp., Inc.*, 2014 WL 359956, at *1 (D. Mass. 2014); *Reitz v. Creighton*, 2019 WL 5798680, at *1 (N.D. Ill. 2019). This case is a poster child of why courts have expressed concern that misconduct in discovery is occurring with increasing frequency in federal litigation.

This case has degenerated into accusations and cross-accusations of discovery misconduct between Plaintiffs' counsel and United. The Court could award attorneys fees and costs to both sides on their respective motions. But rather than do so at this point, the Court instead cautions the parties' counsel that it possesses the authority to impose sanctions not only on the parties, but also on their attorneys should they persist in obstructive and unreasonable discovery tactics and other litigation

conduct that unnecessarily delays and increases the burden and cost of this litigation. *Allstate Ins. Co. v. Nassiri*, 2010 WL 5248111, at *6 (D. Nev. 2010).

**B.**

The defendant has filed a motion for sanctions against plaintiffs' counsel for his conduct during two deposition sessions of his client, Olga Sokolova. [Dkt. #122]. While not always a model of decorum or civility, the troubles at those depositions have two parents: One, is a disagreement between counsel over a Russian interpreter, the other is the plaintiffs' choice to hire an attorney who resides 100 miles from the courthouse and their failure to comply with Local Rule 83.15, requiring retention by out of town counsel to retain local counsel to at least cover emergencies and receive filings. Plaintiffs will be required immediately to comply with Local Rule 83.15. The facts are these:

**C.**

The deposition began a half-hour late at 10:30, due to plaintiffs' counsel coming in from Milwaukee, where he lives and maintains his office. A spat over the interpreter began immediately when, incredibly, plaintiffs' counsel felt the interpreter had failed to accurately translate the oath. [Dkt. #123-1, at 5-8]. Then, there was some trouble between plaintiffs' counsel and defense counsel that began when defense counsel asked, for no apparent reason to do with this case, why plaintiff emigrated from Russia to the United States *nearly 25 years ago*. [Dkt. # 123-1, at 23-24]. The questions, so far as one can tell, were irrelevant, a waste of time and were contrary to the basic purpose of a deposition, which is to gather relevant information. Discussions about the Lautenberg Amendment and the persecution of Soviet Jewry were inappropriate. [Dkt. # 123-1, at 24]. The appropriate response was to object as to relevance and leave it at that. Plaintiffs' counsel did just that as defense counsel continued improperly to ask irrelevant questions about when plaintiff met

2

her husband, if her parents were alive, how many children she had and whom with, etc. [Dkt. # 123-1, at 25-29].

As defense counsel conceded, she did not get "into the details of this incident" until about 20 transcript pages later, at which point plaintiff – who was 70 years old with several health issues said she was "so tired already . . . ." [Dkt. #123-1, at 44-45]. There were no further interruptions from plaintiffs' counsel through all that, not until page 53 of the transcript, when he objected to a question as misleading. [Dkt. # 123-1, at 53].

The interpreter then began to have trouble because plaintiff/deponent was not stopping after each phrase "because details, details, details, which are extremely important." [Dkt. # 123-1, at 56]. A bit later, plaintiff – who does speak English – disagreed with the interpreter who had translated "few" as "several." The interpreter felt that "few" and "several" were synonyms. [Dkt. # 123-1, at 60-61]. It was at this point – and, again, there had been an extended period without interruptions, that the interpreter asserted:

> I am a professional court interpreter since 1993. I'm not claiming to be an attorney, and I'm not claiming to be a respondent. But I'm just trying to do my professional job as I do for so many years and never had any problems. And for some reason this time, all my efforts are being met with animosity.

[Dkt. # 123-1, at 61]. Plaintiffs' counsel said he "completely agree[d]" with her, and she replied that there were "no hard feelings at all" and she just wanted "some credit." [Dkt. # 123-1, at 62].

Defense counsel resumed her irrelevant and provocative questioning, asking about plaintiff's father, when he died, how often she visited Moscow, if she ever had a problem with a reservation, how often she had flown since the incident, and if she made reservations over the phone. [Dkt. # 123-1, at 62-64]. Finally, plaintiff said, "[t]here are so many questions and we don't even touch the

3

point here." [Dkt. # 123-1, at 64]. Astonishingly, defense counsel said they were "getting there." [Dkt. # 123-1, at 64]. At that point, the sound from counsel's phone was annoying the interpreter, and she asked him to set it to silent, which he did. [Dkt. #123-1, at 65].

Just a bit later, plaintiff indicated it was time for her to check her blood sugar. [Dkt. #123-1, at 70]. The interpreter asked that this not be done in front of her as she would be upset by the sight of blood. Consequently, there was a half-hour break from1:05 p.m. 1:39 p.m. [Dkt. #123-1, at 71]. During the break, plaintiffs' counsel said he had to leave at 3 p.m. because he got an email that he had to pick his son up from school. [Dkt. #123-1, at 72]. Defense counsel said if they didn't finish by the time he had to leave, they would have to bring plaintiff back to finish. [Dkt. #123-1, at 73]. With the imposed time in mind, defense counsel's next question to plaintiff was how she got to the airport the day of her trip. [Dkt. #123-1, at 74].

The next issue that the interpreter had was that plaintiff was answering questions before they were translated – she understood some or a fair amount of English. Plaintiff apologized. And the interpreter asked that counsel tell plaintiff, again, to stop after each phrase. [Dkt. #123-1, at 75]. Plaintiffs' counsel then asked to go off the record to explain the problem to his client because he "sort of agree[d] with the interpreter." [Dkt. #123-1, at 75]. United's counsel complained that they were wasting precious time. [Dkt. #123-1, at 76].

The next interruption from plaintiffs' counsel did not come for ten transcript pages, when defense counsel ask plaintiff whether she could understand why the travel agent was confused by her travel plans. Plaintiffs' counsel objected that this was speculation. Defense counsel asked again and plaintiffs' counsel objected again. [Dkt. #123-1, at 86]. A bit later the interpreter again complained that the plaintiff was talking too fast – nonstop. [Dkt. #123-1, at 91]. There was another brief

4

objection from plaintiffs' counsel a few pages later. [Dkt. #123-1, at 96].

Defense counsel then asked whether plaintiff was in on the conversation between the two air carriers – obviously, she wasn't – and said plaintiff hadn't followed up and hadn't called to confirm and things went along these lines until plaintiff began to cry. [Dkt. #123-1, at 97-100]. The interpreter then interrupted to say plaintiff was confusing to translate and plaintiffs' counsel explained that she was upset. [Dkt. #123-1, at 101].

Right after that, plaintiffs' counsel complained that the interpreter missed the fact that plaintiff had to take a taxi across Warsaw with her luggage. The interpreter responded, "[h]e does my job now, so I can relax." [Dkt. #123-1, at 103]. Plaintiffs' counsel apparently replied with a glare, and the following exchange ensued:

> INTERPRETER: Please don't give me this look, counsel. Would you please ask [plaintiffs'] counsel not to look at interpreter. This is not very pleasant look of his.
>
> DEFENSE COUNSEL: Yes, I would ask [plaintiffs'] counsel not to be inappropriate.
>
> INTERPRETER: You're very sensitive to the needs of your client, so, by all fairness, relax and let interpreter do her professional job for the sake of your client.
>
> PLAINTIFFS' COUNSEL: Who said it's professional?
>
> INTERPRETER: Counsel, this is an offense.
>
> PLAINTIFFS' COUNSEL: Let's stop it. Stop it.
>
> INTERPRETER: Counsel, please ask counsel not to interfere with my professional job. This counsel is being rude and obstructive and very impolite, very unprofessional. He has nothing to do with.
>
> DEFENSE COUNSEL: [Counsel], I would ask that you not attack the interpreter.

> PLAINTIFFS' COUNSEL: I have my own opinion as to the mediocre quality of that translation and multiple and continuous errors in translation and mistakes. That's why I don't call it professional.
>
> INTERPRETER: Counsel, interpreter will ignore this negative because interpreter is doing her best to work for you.
>
> UNITED'S COUNSEL: For the record, there's been a ton of interruptions here, [sic] and I am not being able to conduct a deposition, and this is going to have to be continued, and we may have to be seeking our costs and fees because this is completely improper.
>
> PLAINTIFFS' COUNSEL: I can see that you are also shaking almost uncontrollably.
>
> DEFENSE COUNSEL: I am not.
>
> PLAINTIFFS' COUNSEL: Are you okay?
>
> INTERPRETER: What a statement.

[Dkt. #123-1, at 104-105]. This continues with the attorneys going back and forth regarding availability of dates on which to continue the deposition. Finally, they agreed on October 11th.

Things went smoothly on the 11th, until about 20 pages into the transcript when plaintiffs' counsel briefly objected to a translation – "sitting under" as opposed to "laying under." [Dkt. #123-2, at 19]. Defense counsel noted the objection and tried to continue, but the interpreter interrupted:

> Counsel, interpreter will ask Counsel to kindly repeat the question. Because interpreter was interrupted and distracted by the comment which was not even necessary. Talking about -- in English language, it's completely appropriate to say sitting or laying because it's a figure of speech. It's not that somebody, a person, was sitting or laying. That would be different. But a document was sitting behind another document, aligned with that, that is a completely different figure of speech, which is completely appropriate. Counsel would know
>
> \* \* \*
>
> -- if he were an interpreter, but he's not. He's not.

6

[Dkt. #123-2, at 20].

Defense counsel explained that plaintiffs' counsel was free to make such objections, but not speaking objections which, he had not done in this instance. [Dkt. #123-2, at 20]. The questioning barely got back underway when plaintiffs' counsel objected to a translation about the tickets being identical, and the interpreter claimed the plaintiff had never said that, exclaiming: "That's a lie. It's a lie." [Dkt. #123-2, at 22-23]. Plaintiffs' counsel said that was "unprofessional and incompetent." [Dkt. #123-2, at 23].

Perhaps two questions later, the interpreter had a problem with United's counsel asking what were thought to be complex questions and suggested she break them down into two instead of one. [Dkt. #123-2, at 25]. The interpreter missed another question, and then had an issue with the plaintiff responding too quickly and asked that she answer one sentence at a time. [Dkt. #123-2, at 29-30].

A bit later the two attorneys had a disagreement over whether a snippet of plaintiff's testimony that was explicative rather than merely responsive should be stricken. [Dkt. #123-2, at 33]. Then plaintiffs' counsel made an "asked and answered" objection. [Dkt. #123-2, at 34]. Then there was another complex question from defense counsel that could not be translated. [Dkt. #123-2, at 37].

About 40 pages into the deposition transcript, plaintiffs' counsel had another translation objection, a translation of "charge for phone call" to "charge for negotiations." [Dkt. #123-2, at 42]. United's counsel noted the objection, but the interpreter interjected:

> Counsel, interpreter stands by the interpretation. The word telephone was not told in this specific piece of monolog and interpreter interpreted religiously word by word. Interpreter has no right to change whatever deponent is saying even if she is saying something strange in [counsel's] opinion.

\*   \*   \*

> Interpreter is standing by her interpretation. Interpreter would like to kindly ask for -- for a private conversation with counselor concerning this very rude unprofessional behavior. Interpreter is not capable to perform or do her job because counsel is constantly interrupting her and making her job very hard for everybody.

[Dkt. #123-2, at 42].

Plaintiffs' counsel said he was interrupting due to the interpreter's (claimed) "incompetency." [Dkt. #123-2, at 43]. United's counsel then complained the plaintiff's lawyer was being abusive and bullying, and that the objections "were interfering with the interpreter." [Dkt. #123-2, at 42-43]. The two attorneys went back and forth and then defense counsel asked for the interpreter's take on the proceedings, to which she responded:

> Thanks for letting interpreter state her opinion. Interpreter is more than willing to do her professional job, interpreting both ways and doing it on her best ability. Interpreter is very happy to work today with all of you and interpreter is asking for – just for some understanding of the difficulty of her work and interpreter is specifically addressing counselor by phone to stop bullying an interpreter. Let interpreter do her job.

[Dkt. #123-2, at 45].

Plaintiffs' counsel disagreed with that characterization and then his client spoke up and said she was not coming back for a third deposition if things did not get back on track. " [Dkt. #123-2, at 45-46]. The interpreter and plaintiffs' counsel then had a set-to over the translation of that with the interpreter calling plaintiffs' counsel "a liar." [Dkt. #123-2, at 43-44]. That was it. Defense counsel said if plaintiffs' counsel was going to keep objecting to translations, she would not continue and would bring the matter to the court. " [Dkt. #123-2, at 49]. Plaintiffs' counsel reminded her he had a right to object if he thought a translation was improper. He also objected to the continuing of the deposition to a third session. " [Dkt. #123-2, at 49-50]. United's counsel called him a bully and

8

unprofessional and ended the deposition. [Dkt. #123-2, at 43].

There is, as there often is, a bit of *Rashomon* to this drama. Defense counsel feels she was thwarted at two deposition sessions with repeated, abusive interruptions. [Dkt. #123, at 6-7]. No doubt a cold record may not effectively convey the tone of the plaintiff's lawyer or the caustic and interrupting effect of the plaintiffs' lawyer's behavior. Justice Jackson's observation that "a few minutes' observation of the parties in the courtroom is more informing than reams of cold record" has pertinence here. *Ashcraft v. State of Tenn.*, 322 U.S. 143, 171 (1944)(dissenting opinion) applies to depositions as well as trials. But, plaintiffs' counsel had a right to object when he legitimately felt a translation was inaccurate. And, there were no more than two or three such translation objections at each session. That's not a lot of interrupting.

Obviously, on each occasion counsel must explain what part of the translation it is that he finds inaccurate, even though speaking objections are technically improper. These interruptions were invariably extended not by counsel, but by soliloquies from the interpreter. It should be pointed out that after the first session, it may have been wise to engage a different translator, perhaps one who was court approved as professionally qualified as opposed to language skilled, but defense counsel didn't take that opportunity. Moreover, defense counsel wasted a portion of her deposition time with irrelevant questioning we see too often. *See e.g., United States ex rel. Baltazar v. Warden*, 302 F.R.D. 256, 267 (N.D. Ill. 2014)("Time wasted on irrelevant questions during the original deposition count against the 7 hours allowed by the Rules.").

"The court's fundamental job is to determine whether a given legal fee—say, for taking a deposition or drafting a motion—would or would not have been incurred in the absence of the sanctioned conduct. The award is then the sum total of the fees that, except for the misbehavior,

9

would not have accrued." *Goodyear Tire & Rubber Co. v. Haeger*, – U.S. –, –, 137 S. Ct. 1178, 1187 (2017). Clearly, defense counsel can't properly ask for the total costs of the two deposition sessions, as she has done here. [1]

That being said, it cannot be denied that when he interrupted, plaintiffs' counsel often tended to be vituperative or intemperate. He tended to go from zero to insulting rather quickly, often without much, if any, provocation. There was no need to follow up every proclamation from the interpreter with an insult and allow things to unravel further from there. The nuclear option is never the only or proper one and plaintiff's lawyer knew that. Counsel should be the bigger person; he clearly has not been. As a veteran member of the bar, he is required to have more regard for the difficulty of the interpreter's task in this situation and for the difficulties confronting defense counsel. The interpreter struggled through two sessions with a witness who doesn't have a good understanding of the process. Like many litigants, she may have been under the misimpression that this is her chance to finally be heard and tell her story. Of course, it's not, and her lawyer – if he did not – should have properly prepared her for the limited role performed by any deposition and explained fully to her its limitations.

A deponent should be made to understand the limited function of the deposition. Unfortunately, all too often, a lawyer defending a deposition resorts to obstructionism to prevent the

---

[1] Irrelevancy of a question is not grounds to instruct a witness not to answer the question. Unless and until the pervasive or other nature of the questioning makes it obvious that it is necessary to stop the deposition and seek relief under Rule 30(d)(3) for being conducted in bad faith, or to embarrass, annoy, or oppress the deponent, questions that may be irrelevant must be answered by (30)(d)(3)." *In re Stratosphere Corp. §. Litig.*, 182 F.R.D. 614, 619 (D. Nev. 1998). It is not the embarrassment or annoyance which may be caused by unfavorable answers that is the criterion of 30(d)(3). It is the "manner" in which the interrogation is conducted that is grounds for refusing to proceed, followed by the required motion to seek relief.. Here defense counsel never called the court or adjourned the deposition to seek the court's intervention.

examiner from obtaining the sought after information. But, nastiness and inappropriate and improper interruptions and misdirection – operating under the guise of cleverness (or claimed to be justified as devices to "protect the witness") are often employed to interfere with a perfectly proper inquiry. Unfortunately, all too often, these illicit stratagems are successful, and the examiner fails in the attempt to gather relevant information, which of course, is the goal of all examinations.

Here the conduct of the plaintiff's lawyer at times left something to be desired. But there were other factors at play. The lawyers had to deal with translation issues from the witness and an attorney who speak both Russian and English, and with an examiner who at times had her own issues.

In short, as a matter of discretion I shall not award discovery sanctions on this record, recognizing that another judge might have come to a different conclusion on this record. Indeed, on a virtually identical set of facts, two decision makers can arrive at opposite conclusions, both of which can constitute appropriate exercises of discretion and both be affirmed on appeal. *See Mejia v. Cook County, Ill.,* 650 F.3d 631, 635 (7th Cir.2011); *United States v. Banks,* 546 F.3d 507, 508 (7th Cir.2008). *Cf. United States v. Bullion,* 466 F.3d 574, 577 (7th Cir.2006). "The very exercise of discretion means that persons exercising discretion may reach different results from exact duplicates. Assuming each result is within the range of discretion, all are correct in the eyes of the law." *McCleskey v. Kemp*, 753 F.2d 877, 891 (5th Cir. 1985), *aff'd, McCleskey v. Kemp*, 481 U.S. 279, 289-290 (1987). *See also Mejia v. Cook County, Ill.,* 650 F.3d 631, 635 (7th Cir.2011);*United States Securities & Exch. Comm'n v. Benger,* 2016 WL 561893, at *3 (N.D. Ill., 2016).

That does not mean that the future will be as charitable or that the conduct of the Plaintiffs' counsel will be tolerated any longer. It will not. A word to the wise ought to be sufficient to preclude time-wasting, irritating, provocative squabbles in the future. If it is not, appropriate action will be

taken promptly. Additionally, the time has come to require plaintiffs to abide by Local Rule 83.15. The leeway plaintiffs' lawyer has effectively been permitted (by inaction) over the preceding year and a half has repeatedly interfered with these proceedings. *See, e.g,* Dkt. # 93, 95 (counsel complains that it is burdensome to drive from Milwaukee for 8:30 a.m. hearing); Dkt. #98 (claim he was medicated and unable to travel from Milwaukee for rescheduled hearing); Dkt. #112 (counsel claim to be unable to drive from Milwaukee for hearing due to child care issues); Dkt. #121 (counsel and plaintiffs fail to appear); Dkt. # 123-1, at 1 (counsel arrives half hour late); #123-1, at 71-73 (counsel leaving early to return to Milwaukee); #123-1, at 105-06 (counsel unavailable to resume deposition due to claimed appointment in Milwaukee); #130 (counsel unable to make morning hearing and return to Milwaukee for a claimed afternoon doctor's appointment)].

Local Rules are promulgated for sound reasons. Rule 83.15 certainly was, and the time has come for plaintiffs and their counsel to comply with that Rule and secure local counsel. Enough is enough. *See e.g., Stevo v. Frasor*, 662 F.3d 880, 886-887 (7th Cir. 2011); *Ammons v. Aramark Uniform Services, Inc*., 368 F.3d 809, 817–18 (7th Cir.2004); *Waldridge v. American Hoechst Corp.,* 24 F.3d 918, 923 (7th Cir.1994); *In re Sulfuric Acid Antitrust Litigation*, 231 F.R.D. 351, 356 (N.D.Ill. 2005))(collecting cases). But I do not think Local Rule 83.15 is one that can be ignored or relaxed. Nor should it be. There comes a time when enough is enough. *See, e.g., Willoughby v. Peterson*, 2016 WL 890755, at *2, n.2; *Bulgari, S.P.A. v. Zou Xiaohong*, 2015 WL 6083202, at *1 (N.D. Ill. 2015)(N.D. Ill. 2016); *State Farm Fire & Cas. Co. v. Electrolux Home Prod., Inc*., 2011 WL 133014, at *1 (N.D. Ill. 2011); *Leventhal v. Schenberg*, 2013 WL 1809889, at *3 (N.D. Ill. 2013). The Plaintiffs have until 2/19/20 to comply with Local Rule 83.15 [see also Dkt. #139] or I shall recommend to the District Court that the case be dismissed.

ENTERED: /s/ Jeffrey Cole
UNITED STATES MAGISTRATE JUDGE

**DATE:** 1/21/20